IN THE

# SUPREME COURT OF GEORGIA,

## AT ATLANTA.

### MARCH TERM, 1888.

PRESENT.—L. E. BLECKLEY, . . . . . . . . . CHIEF JUSTICE.
M. H. BLANDFORD, . . . . . . . . Associate "
T. J. SIMMONS, . . . . . . . . . Associate "

## WARE *et al. vs.* BARLOW

1. The declaration in the code that possession, to be the foundation of prescription, must not originate in fraud, means such fraud as is actual, moral fraud, as distinguished from legal fraud. *Hunt et al. vs. Dunn et al.,* 74 *Ga.* 120, doubted and distinguished.

(a) Where the evidence shows that defendant purchased the land in question from the agent of two executors; that the power of attorney, under which the agent sold, recited that they were the executors of a testator, some of whose heirs at law are the plaintiffs, and further recited that such executors, under his will, had the right to sell this land, and contained no intimation that there was another executor, or that the property in question was not mentioned in the will; and the evidence further shows that defendant paid a large sum of money for the land, went into immediate possession of it and held it from that time up to the commencement of this litigation, claiming it in good faith; if the title he thus acquired was not a good legal title, it was a mistake of law on his part and on the part of the parties from whom he purchased, no actual fraud being shown on the part of either.

(b) Even if defendant had looked at the will and found that three executors were appointed in it, and that this land was not mentioned in it, it could hardly be held that he was guilty of a fraud if he had

v81—1.

concluded that two of the executors had the right to carry out the provisions of the will and to sell this land.

2. The record further shows that the land was sold to defendant in June, 1866; that most of the parties plaintiff had notice of the sale at that time, and some of the heirs shared in its proceeds; and that the action was not begun until seventeen years after the purchase was made and fifteen years after all had notice. It seems that it would be a fraud, under the facts, to deprive defendant of the land.

(a) While the court below might have left the matter of good faith to the jury, yet as they would have been obliged to find in favor of defendant, the case will not be sent back for another trial.

May 9, 1888.

Title. Prescription. Fraud. Notice. *Laches.* Wills. Executions. Before Judge WELLBORN. Lumpkin superior court. October term, 1887.

The plaintiffs in error brought their action of ejectment, on March 18, 1887, against certain tenants of the defendant in error, who, on December 1, 1887, was made a party to the cause, for five-sevenths undivided interest in lot of land number 727 in the 12th district and 1st section of Lumpkin county, known as the Pigeon Roost gold-mine, and for mesne profits. The defendant pleaded not guilty, the statute of limitations of four years and a prescription under color of title.

On the trial, it was admitted that four of the plaintiffs were children of Edward Ware, who died November 20, 1861. The other four are the heirs of a deceased son of Edward Ware. Edward Ware, at the time of his death, left nine children, and they were his sole heirs at law. Two of them died before the bringing of this suit, leaving no wife, husband or lineal descendant.

Among other things the plaintiffs put in evidence an act of the legislature of Georgia, passed October 12, 1866, (acts 1866, p. 103,) incorporating the Georgia Company, for mining and other purposes, in which George G. Pride, S. L. M. Barlow, and such other persons as were then or might thereafter become associated

with them, were constituted a body corporate, etc. Also a certified copy from the records of the court of ordinary of Floyd county, dated January 13, 1862, granting letters testamentary to A. A. Terhune, as one of the executors of Edward Ware.

R. H. Moore testified that he made the deed, hereafter referred to, in which he appears to be grantor. He put Pride in possession of the lot, and did not know with whom Pride was associated at the time, but thinks he occupied for himself, Barlow and one Grant. When Edward Ware claimed the lot, no one was in actual occupation of it. Ware employed witness to sell the lot for $5,000, and witness was to have all he got over that sum. He sold the land to Pride, who paid him in full and was put in possession in 1866. The sheriff sold the land in 1870 or 1871, and Barlow has been in continuous, public and notorious possession since then. At the time of the sale to Pride, there was a man named Smith in possession, claiming the land as his own, and said he had been in possession sixteen years. The witness made a bargain for it with Smith, and took possession, acting for James W. and B. F. Ware, or for the Ware estate. He paid Smith $500, borrowed from Pride. After the sheriff's sale, Rice was put in possession for Barlow and controlled the land for him.

A. A. Terhune swore that he was managing executor of the estate of Edward Ware; that he was present when Ware's will was written, and as this was being done Ware described the property; that he had heard Ware speak of the land in dispute; that Ware knew of the lot at the time he was making his will, but said he had mislaid the title; that witness had no knowledge of the power of attorney (hereafter referred to) for the sale of this land, and first heard of it about the time of the trial; that he was not consulted about the making of the deed, and in 1882 first heard that the land had been

conveyed by the other executors; that before 1870 he heard that they had sold their interest in the lot, not the whole title; that his wife is Edward Ware's daughter, and has never got any money from the lot; that he could not say he had ever resigned his administratorship; that James P. Ware, one of the executors, died in 1870, and B. F. Ware, the other executor, is still living, and consented to the bringing of this suit; and that Edward Ware had no other real estate not included in his will, except this lot, that witness had heard of, etc.

It was admitted that if Edward Ware ever owned the lot in controversy, he owned it prior to and at the time of the execution of his will. This will disposed of a large amount of property, real estate, negroes, etc., but did not mention the land in dispute; appointed his sons, J. P. and B. F. Ware, and his son-in-law, A. A. Terhune, executors; and, by the 8th item thereof, provided that all of his land, except a certain tract specifically bequeathed, should be sold by his executors at either public or private sale as they might think best.

Among other things, the defendant put in evidence a quit-claim deed to the land in dispute from Green B. Smith to J. P. and B. F. Ware, executors of Edward Ware, dated March 17, 1866, consideration, $500; also a power of attorney from the said two executors to R. H. Moore, authorizing him to sell the lot in dispute, reciting that, by the 8th item of the will of Edward Ware, said executors were authorized to sell the land at public or private sale, and stating that the title of Edward Ware was inherited from his brother, Alexander Ware; that Edward and Thomas Ware were the only heirs of Alexander; that Edward, by division, acquired his brother's interest; and empowering either public or private sale. It was dated July 25, 1865. Also a deed from Moore, as attorney in fact, to George G. Pride, S. L. M. Barlow and William L. Grant, to the land in dis-

pute; consideration, $15,000; date, June 15, 1866. Also a number of executions against the Georgia Company, transferred to Barlow and levied on much property, including the lot in dispute, with entry of sale to Barlow; also sheriff's deed under these executions, dated February 8, 1871, conveying the real estate levied on. Also letters testamentary to J. P. and B. F. Ware on the the estate of Edward Ware, dated November 23, 1861.

All other material facts are stated in the opinion.

WRIGHT, MEYERHARDT & WRIGHT, HALL & HAMMOND and R. H. BAKER, for plaintiffs.

PRICE & CHARTERS and H. H. PERRY, for defendant.

SIMMONS, Justice.

Counsel for the plaintiffs in error insisted on four propositions for reversal of the judgment of the court below in this case: (1) that the court erred in ruling that Barlow did not derive his title from Edward Ware; (2) that the court erred in holding that the executors of Edward Ware had power to sell the land in question, under the 8th item of the will, it not being in the lands enumerated therein; (3) that the court erred in holding that the deed made by the two executors, without the knowledge or concurrence of Terhune, the other executor, was good; and (4) that the court erred in holding that the defendant, Barlow, had a good title by prescription. The view we take of this case renders it unnecessary to discuss any of these propositions, except the last.

Under the facts as disclosed by the record, did Barlow, the defendant in error, have a title by prescription to this lot of land? Counsel for the plaintiffs in error insist that he did not. They contend that the power of attorney which the executors gave to Moore recited the provisions of Edward Ware's will; that it was the duty

of Barlow to have looked to that will, and that if he had done so he would have discovered that there were three executors appointed under the will, and that they had the power only to sell certain lands therein described; that whether they looked at the will or not, the recital in the power of attorney to Moore was sufficient to put them on inquiry; and that they were, therefore, chargeable with notice that the two executors had no authority to sell, or that if they had power to sell anything, they were not authorized to sell this particular lot of land, because it was not mentioned in the will. They insist, therefore, that having this notice of the want of authority of the executors to sell this land, his action amounted in law to a fraud, and no prescription would arise in his favor. They contend that a legal, as well as a moral fraud, would prevent prescription from commencing to run. We do not agree with them in this contention.

1. When the code declares that possession, to be the foundation of prescription, must not originate in fraud, we think the fraud meant is an actual fraud, a moral fraud, a wrongful act, and not a legal fraud, which the law denominates a fraud regardless of the *bona fides* of the parties. In the case of *Virgin vs. Wingfield*, 54 *Ga.* 451, this court, in discussing this identical question, uses the following language: " We have held in several cases that constructive notice does not make a title fraudulent; that the law will not infer fraud in such cases from negligence; that the fraud contemplated must be some conscious, actual wrong, something which shows that the party charged with acting in bad faith, was doing what he must have known was wrong and unfair." In a case between the same parties, in 51 *Ga.* 139, this court held, WARNER, C. J., delivering the opinion, that the fraud must be actual. In these cases, the facts showed that Wingfield was the trustee and had the legal title, and that Weems sold the land to Wylie,

and the bill alleged that Wylie knew that Weems had no power or authority to sell; and the court said that in a case of that kind the fraud must be actual.

In the case of *Wright vs. Smith*, 43 *Ga.* 291, McCay, J., in treating of this question, says : "The question of adverse possession is one of intention, and turns upon the *bona fides* of the tenant.   To charge him with fraud, so as to vitiate his possession, the facts must be such as to affect his conscience.   They must be brought home to him.   It is true that one who buys property with constructive notice of an outstanding claim is in some sense charged with fraud—implied fraud.   He is bound to look to the record; he is bound to follow up any fact which should put a prudent man on the watch; and if he fail to do this, he is looked upon as guilty of neglect. But if we take this view of the notice referred to in the section of code under consideration, we should destroy the whole doctrine of prescription.   If one who buys property looks to the record—follows up every fact which ought to put a prudent man on the watch—and only buys when he finds nothing wrong, then he gets a good title, and the statute of prescriptions is wholly useless.   According to the argument, one can only set up a prescriptive title when he has had seven years' possession under a legal title.   The very object of the statute is to protect persons in possession under defective titles, and if it can only be used to protect one who has bought without notice, either actual or constructive, of the outstanding rights of third persons, then the statute is wholly worthless, since such a purchaser would be protected without it.   To charge the person in possession with notice, even of a fraud in his deed, the facts must be such as to charge his conscience.   He must be cognizant of the fraud, not by construction but by actual notice.   .   .   .   No man can be fairly said to hold land adversely to another who, at the time he goes into

possession, has notice that he is committing a fraud, that the title under which he enters is forged or fraudulent. His entry is not *bona fide;* his claim of right is only pretended. But if he have no actual notice, if he honestly thinks his claim good, if he does not have notice—actual notice, he may be very well said to hold adversely. He is in earnest. He does not merely pretend to a right, but really claims it." In the case of *Salter vs. Salter,* decided at the last term of this court, (80 *Ga.* 178,) BLANDFORD, J., delivering the opinion, said: " We think that the fraud mentioned there (in the code) means positive fraud—actual fraud, not constructive or legal fraud. It must be such a fraud as affects the conscience. If they had reason to believe, and did believe, that the property was subject to the execution, although they might have known of the claim set up by the complainants in this bill, then that, in our opinion, would not amount to positive fraud."

Applying these rules to the facts in this case, we find that Barlow purchased this land from the agent of the two executors; that the power of attorney recited that they were the executors of Edward Ware; that they had a right, under this will, to sell this land; that there was no intimation therein that there was another executor; that he paid $15,000 for forty acres of land; that he went immediately into possession of it, and held it from that time up to the commencement of this litigation, claiming it in good faith. If the title he thus acquired was not a good, legal title, it was a mistake of law on his part and on the part of the parties from whom he purchased. The evidence does not disclose a single fact to show that this purchase was made in bad faith, or that any act that Barlow did was wrongful or unfair. If he had looked at the will and had seen that three executors had been appointed, would any court hold that it would have been a fraud on his part if he had

concluded that two of these executors had a right to carry out the provisions of the will? Would any court hold that he was guilty of such a fraud if he had read the will and decided that these executors had a right to sell this property, although it was not mentioned in the will? These propositions are not free from doubt. Judges who have spent the best years of their life in investigating questions of this sort differ about them. It seems from this record that two judges of the superior court have decided in this case that the two executors had a right to sell this particular piece of land. Suppose Barlow had decided it wrong and these two judges in the court below had decided it wrong, would that be such a fraud as to prevent the prescription from commencing to run in his favor? We think not. As the court said in *Wright vs. Smith, supra,* if every person must be satisfied of the legal title before he purchases, there would be no use of a statute of prescriptions. The very object of the statute is to protect persons in possession under a defective title.

2. This record further shows that this land was sold to Barlow in June, 1866, and that most of these parties had notice of the sale at that time and that some of them shared in the proceeds thereof; that Terhune and his wife had notice of it either in 1868 or 1869, and never commenced their action until 1883, seventeen years after this purchase was made, and fifteen years after they all had notice. It seems to us that it would be a fraud to deprive this man of his land, under the facts disclosed by this record.

Counsel for the plaintiffs in error relied mainly on the case of *Hunt et al. vs. Dunn et al.,* 74 *Ga.* 120. If the principle announced in that case is sound law (which I very much doubt), it is distinguishable from this case. The facts show, in that case, that the person under whom the defendant claimed bought the land with notice of

the superior outstanding title of James Lyle. That was a contest between two different titles. The defendant in that case had notice that the other title was superior to the one he bought; whereas in the case now under consideration, Barlow did not attempt to buy an outstanding title, but sought to purchase the only title that he knew of to this land, so far as appears from the record. What more could he have done? As said before, the record shows that he acted in the utmost good faith in this transaction. There is not a suspicion against him of any wrongful act or unfair dealing in the whole transaction. Nothing can be said against him except the fact that he made a mistake in deciding for himself, (supposing he had notice of the contents of the will,) that the executors had a right to sell this land. While the court might have left the matter of good faith to the jury, if he had done so they would have been obliged, under the evidence shown in this record, to find in his favor; and we will not send the case back to go through the form of submitting that question to them.

Judgment affirmed.